# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00699-CV

**Jim Dunn and Ellen Dunn, Appellants**

**v.**

**Public Utility Commission of Texas and Oncor Electric Delivery Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-04-001246, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

This is an appeal of an order of the Public Utility Commission of Texas ("PUC") amending Appellee Oncor Electric Delivery Company's[1] certificate of convenience and necessity to allow the construction of a power transmission line that will cross the property of Appellants Jim and Ellen Dunn. The Dunns complain that the PUC's findings as to the existence of endangered species habitat on their property as well as the impact of the construction of the proposed transmission line on that habitat were not supported by substantial evidence, and that the PUC acted arbitrarily and capriciously in finding that the route of the proposed transmission line complied with PUC Substantive Rule 25.101(c)(6)(D), which requires that—to the extent reasonable within

---

[1] Appellee Oncor Electric Delivery Company changed its name to TXU Electric Delivery Company soon after the Dunns filed their suit in the district court in 2004 attacking the PUC's order. On April 24, 2007, after the Dunns filed their appeal in this Court, Appellee changed its name back to Oncor Electric Delivery Company.

engineering constraints—the line be routed to moderate its impact on affected landowners and to parallel existing rights-of-way and property boundary lines. The district court affirmed the PUC's order. We affirm the judgment of the district court.

## BACKGROUND

Oncor is an investor-owned electric utility company. On December 31, 2002, Oncor filed an application with the PUC to amend its certificate of convenience and necessity ("CCN") to construct a 15.7-mile, 138-kilovolt, single-circuit transmission line in western Bell County and southern Coryell County (the "Project"). Oncor's application included six potential routes for the Project—a preferred route and five alternative routes. The preferred route runs through the Dunns' property along a proposed 70-foot-wide easement.[2]

After an administrative hearing before the State Office of Administrative Hearings in September 2003, in which the City of Copperas Cove and other potentially affected landowners (including the Dunns) intervened, the administrative law judge prepared a Proposal for Decision granting Oncor's application to amend its CCN and approving the preferred route for the location of the transmission line. The PUC adopted the administrative law judge's Proposal for Decision in its entirety, including findings of fact and conclusions of law, in a final order signed February 3, 2004. The Dunns filed a motion for rehearing with the PUC. No Commissioner voted to consider the

---

[2] The Dunns' property in question is an approximately 33-acre, rectangular tract that straddles the boundary between Bell and Coryell Counties just south of the city of Copperas Cove. The U.S. Army's Fort Hood Military Reservation adjoins the Dunns' property on the east and northeast. There is one house on the property. Mrs. Dunn testified that she has made the property her home since 1989.

2

motion for rehearing, and the PUC's order became final on March 15, 2004. The Dunns timely appealed the PUC's order to the district court. The district court entered judgment affirming the PUC order. The Dunns appeal from the judgment of the district court.

The Dunns have two complaints on appeal. First, the Dunns take issue with the PUC's analysis of the impact of the preferred route on endangered species whose habitats are in the vicinity of the route. Specifically, the Dunns argue that the PUC's findings of fact relating to the environmental impact of the preferred route on protected habitat are not supported by substantial evidence. Second, the Dunns argue the PUC was obligated by rule to select a route that followed a greater percentage of existing rights-of-way and property boundary lines than the preferred route, and the PUC's failure to do so was arbitrary, capricious, an abuse of discretion, and not supported by substantial evidence.

**Standard of Review**

We review the PUC's findings of fact under the substantial evidence standard of review. *See* Tex. Util. Code Ann. § 15.001 (West 2007); *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, no pet.). We presume that the PUC's order is supported by substantial evidence, and the Dunns have the burden to demonstrate otherwise. *ASAP Paging, Inc. v. Public Util. Comm'n*, 213 S.W.3d 380, 392 (Tex. App.—Austin 2006, pet. denied).

An administrative decision is supported by substantial evidence if the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d

3

114, 116 (Tex. 1988). Substantial evidence requires "only more than a mere scintilla," and the evidence on the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792-93 (Tex. 1995). We may not substitute our judgment for that of the agency on the weight of the evidence. *ASAP Paging*, 213 S.W.3d at 392. The test is not whether in our view the agency reached the correct conclusion but whether some reasonable basis exists in the record for the agency's action. *Id.* at 393. We will consider an administrative agency's decision to be arbitrary and capricious or an abuse of discretion if the agency reaches a completely unreasonable result after weighing the relevant factors established by the legislature. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

**Environmental Integrity**

Under the Public Utility Regulatory Act ("PURA"), an electric utility must obtain a CCN from the PUC in order to install, operate, or extend electric utility service to the public. *See* Tex. Util. Code Ann. § 37.051 (West 2007). To approve an application to obtain or amend a CCN, the PUC must find that the proposed CCN is "necessary for the service, accommodation, convenience, or safety of the public." *Id.* § 37.056(a) (West 2007). Section 37.056(c) of the PURA sets forth the criteria according to which the PUC is to make its determination:

> The commission shall grant each certificate on a nondiscriminatory basis after considering:
>
> (1)    the adequacy of existing service;
>
> (2)    the need for additional service;

4

(3)     the effect of granting the certificate on the recipient of the certificate and any electric utility serving the proximate area; and

(4)     other factors, such as:

     (A)     community values;
     (B)     recreational and park areas;
     (C)     historical and aesthetic values;
     (D)     environmental integrity; and
     (E)     the probable improvement of service or lowering of cost to consumers in the area if the certificate is granted.

Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, sec. 37.056(c), 1997 Tex. Gen. Laws 713, 787 (amended 2003) (current version at Tex. Util. Code Ann. § 37.056(c) (West 2007)).[3] The PUC determined that the Project was "necessary for the service, accommodation, convenience, and safety of the public within the meaning of PURA [section] 37.056, taking into consideration the factors set out in PURA [section] 37.056(b) and (c)," and, therefore, approved Oncor's application and selection of the preferred route.

The Dunns' first and second issues on appeal question the PUC's consideration of the "environmental integrity" factor. The PUC's findings of fact regarding environmental integrity are as follows:

38.     Construction and operations of the Proposed Project on the Preferred Route will have minor impact on natural and human resources. Most of the Preferred Route will be constructed on pastureland, existing rights-of-way, or along property lines.

---

[3] In 2003, section 37.056(c) of the PURA was amended to include another factor for the PUC's consideration—the effect of granting the certificate on the state's ability to meet the renewable energy goals established by PURA section 39.904(a). *See* Act of May 28, 2003, 78th Leg., R.S., ch. 295, § 2, 2003 Tex. Gen. Laws 1264. The new factor does not apply in this case because Oncor filed its application with the PUC before the statutory amendment.

39.	Burns & McDonnell contacted the United States Department of the Interior Fish and Wildlife Service (USFWS) and the Texas Parks and Wildlife Department (TPWD) to obtain information regarding the possibility of encountering any endangered or threatened species in the affected area.

40.	There are no known threatened or endangered plant species occurring within the study area.

41.	The black-capped vireo and the golden-cheeked warbler are classified by the USFWS as endangered species protected by the Endangered Species Act.

42.	The black-capped vireo and the golden-cheeked warbler nest in the woodlands of Fort Hood Military Reservation.

43.	USFWS has not designated a critical habitat for either the black-capped vireo or the golden-cheeked warbler.

44.	Neither the black-capped vireo nor the golden-cheeked warbler habitat is crossed by Oncor's proposed routes.

45.	USFWS advised Oncor that if suitable habitat exists along the Preferred Route, Oncor should conduct breeding season surveys to determine if the area is actually being used by the vireo and warbler and if either of them does occur in the area, select a route to avoid coming within 300 feet of occupied habitat. Alternatively, in the absence of a breeding season survey, Oncor should conduct activities outside the breeding season (i.e. avoid construction activities between March 1-September 1). In areas of suitable habitat, to avoid adverse impacts on this habitat, USFWS recommends that the maximum clearing width be 16 feet or less.

46.	The process of transmission line construction and operation is not likely to have a negative impact on endangered or threatened wildlife species the area of the Proposed Project.

Central to the environmental integrity inquiry was the impact of the preferred route on the black-capped vireo and the golden-cheeked warbler, both classified as endangered species. The Dunns take issue with the PUC's findings that the preferred route will not cross either the black-capped vireo's or the golden-cheeked warbler's habitat and that the preferred route's construction

6

and operation are "not likely to have a negative impact" on the endangered species. The Dunns assert that the PUC's findings of fact on environmental impact are not supported by substantial evidence. The Dunns also assert that the findings of fact do not reasonably support the PUC's conclusion that the Project's preferred route satisfies PURA section 37.056.

All parties agreed that occupied habitat of both the black-capped vireo and the golden-cheeked warbler existed in the western portions of the Fort Hood Military Reservation. There was also no dispute that the preferred route, as it crossed through undeveloped property neighboring the Dunns' property as well as the Dunns' property, traveled just outside the western boundary of the Fort Hood Military Reservation. However, there was no evidence that occupied habitat was present on the preferred route or on the Dunns' property. Cyril Welter, a senior project manager for Burns & McDonnell Engineering Company Inc., the engineering and environmental consulting firm hired by Oncor for the Project, testified that there were "a couple" of known occurrences of the birds approximately 400 feet from the preferred route. The Dunns' expert witness on the environmental impact of the preferred route, wildlife biologist Allison Arnold, testified that because a population of the endangered birds existed on the Fort Hood Military Reservation it was "highly likely" that areas crossed by the preferred route could become occupied in the future. She also testified that although there was no known population of the endangered birds on the preferred route, it is possible that occupied habitat existed along the route but was, as yet, undiscovered. However, Arnold acknowledged that she could not say that occupied habitat currently existed along the preferred route, and that without an on-ground habitat assessment, there was no way to know for

7

sure. Arnold had not conducted such an assessment, and Welter testified that the standard practice was for such assessments to be conducted once the PUC has approved a route.

The Dunns argue that the PUC's finding of fact to the effect that the preferred route *did not* cross habitat of either the black-capped vireo or the golden-cheeked warbler is inconsistent with the state of the evidence, which reflects that while there was no evidence that the preferred route crossed occupied habitat, it was acknowledged by experts on both sides that previously unknown occupied habitat might exist along the route, and that an on-ground habitat assessment would be needed to rule it out. However, the PUC's finding of fact is supported by the record. There was no evidence of the existence of occupied habitat along the preferred route. Thus, as of the date of the PUC's order, there was no basis for the PUC to find that occupied habitat existed along the route.

In light of the undisputed evidence in this record, the Dunns' complaint on appeal is not so much that the PUC's findings of fact are not supported by substantial evidence—indeed, a finding that the preferred route crossed occupied habitat would not have been supported by any evidence—but, rather, that the PUC should have included limiting language in its findings such as "given the current data" or "as of this time" because there was evidence that undiscovered occupied habitat might currently exist along the preferred route and/or occupied habitat might develop along the preferred route in the future. In fact, the PUC accounted for such possibilities in Ordering Paragraphs 2 and 3 of its final order:

> 2.  Oncor shall perform a habitat assessment for the black-capped vireo and the golden-cheeked warbler . . . on the Preferred Route running close to the northwest boundary of Fort Hood Military Reservation to determine if the Preferred Route crosses the habitat of either bird.

8

3. If Oncor finds that the Preferred Route crosses the habitat of either bird, Oncor shall: (1) comply with the recommendations of the United States Department of Interior Fish and Wildlife Service, as specified in Finding of Fact No. 45; (2) make minor modifications to the centerline of the route with landowner approval in order to avoid the habitat; or (3) take such other action as is recommended by the United States Fish and Wildlife Service and agreed to by Oncor.

Thus, the PUC's findings of fact are consistent with the state of the record before it, and the ordering paragraphs take into account the possibility that unknown occupied habitat may be discovered in the process of constructing the transmission line.

Furthermore, environmental integrity is only one factor that the PUC may consider under PURA section 37.056(c). The PUC also weighed evidence indicating that there was a need for additional transmission capacity in the Copperas Cove area, that the Project was the best option to meet that need, and that the preferred route would adequately address community concerns about proximity to residences and visibility (the top two concerns identified in a public questionnaire from Oncor's August 24, 2000 "open house" meeting), would pass near the fewest number of recreational areas, parks, historical and archeological sites, commercial buildings, and churches, and would result in a lower cost passed on to consumers. We will not substitute our judgment for that of the PUC on whether the mere potential of an environmental integrity issue should outweigh the PUC's findings of fact on such other statutory factors. "None of the statutory factors is intended to be absolute in the sense that any one shall prevail in all possible circumstances." *Public Util. Comm'n v. Texland Elec. Co.*, 701 S.W.2d 261, 267 (Tex. App.—Austin 1985, writ ref'd n.r.e.).

9

**Use of Existing Rights-of-Way**

In their third issue, the Dunns challenge the PUC's conclusion of law relating to the use of existing rights-of-way for the preferred route:

> 7.  Pursuant to P.U.C. SUBST. R. 25.101(c)(6)(D), the Preferred Route parallels existing road, pipeline, and transmission line rights-of-way for the majority of its length.

Given that the preferred route parallels existing rights-of-way, property lines, or other natural or cultural features for seventy-two percent of its length, the Dunns acknowledge that the conclusion of law is accurate. However, because two of the alternate routes proposed by Oncor[4] paralleled existing rights-of-way for eighty-four percent and eighty-eight percent of the length of their routes, respectively, the Dunns argue that the PUC's determination that the selection of the preferred route complies with PUC Substantive Rule 25.101(c)(6)(D) is not supported by substantial evidence. The implication of the Dunns' argument is that if there is evidence in the record that an alternate route will utilize a higher percentage of existing rights-of-way, selection of any other route will not be supported by substantial evidence regardless of other factors.

The rule, however, does not support such exclusive reliance on the numerical percentage of existing rights-of-way used or paralleled by the chosen route. PUC Substantive Rule 25.101(c)(6)(D) provides as follows:

> A new transmission line shall meet the criteria in [PURA section] 37.056 and considering those criteria, engineering constraints, and costs, shall be routed to the extent reasonable to moderate the impact on the affected community and directly affected landowners unless grid reliability and security dictate otherwise. The following factors shall be considered . . . :

---

[4] Neither of the two alternate routes crossed the Dunns' property.

10

(i)     whether the preferred and alternate routes utilize existing compatible rights-of-way, including the use of vacant positions on existing multiple-circuit transmission lines;

(ii)    whether the preferred and alternate routes parallel existing compatible rights-of-way; and

(iii)   whether the preferred and alternate routes parallel property lines or other natural or cultural features.

26 Tex. Reg. 8022 (2001), *repealed in part and amended in part by* 27 Tex. Reg. 10022 (2002) (former 16 Tex. Admin. Code § 25.101(c)(6)(D)) (Tex. Pub. Util. Comm'n).[5] The plain language of the rule grants the PUC authority to consider and weigh a variety of factors—engineering constraints, costs, grid reliability, and security, along with the criteria in PURA section 37.056—in addition to the use of existing rights-of-way in determining the most reasonable route for a transmission line. As with environmental integrity, no one factor controls or is dispositive. The PUC is expressly directed to consider the various factors and their impact on landowners *to the extent reasonable*.[6] There is substantial evidence in the record that the preferred route takes into consideration and makes reasonable accommodation for all of the various factors required by the

---

[5] The PUC amended PUC Substantive Rule 25.101 effective January 1, 2003, moving the provision at issue from subsection (c)(6)(D) to subsection (b)(3)(B). *See* 16 Tex. Admin. Code § 25.101(b)(3)(B) (2005) (Tex. Pub. Util. Comm'n, Certification Criteria). Because Oncor filed its application with the PUC prior to such effective date, we consider the pre-amendment version of the rule.

[6] We note that the final percentage of the preferred route's use of existing rights-of-way and property lines may be higher than the percentage reflected in the record. Oncor noted in its briefing that negotiations with property owners regarding the placement of its facilities on their properties would continue and some adjustments to the route could be made to accommodate certain requests by property owners. Specifically, Oncor suggested that realigning the preferred route to the eastern property line of the Dunn property might be a "viable routing modification." While it does not eliminate the transmission line from running on or near the Dunns' property, such an adjustment or accommodation might well mitigate or moderate the impact of the selected route on the Dunns.

11

applicable statutes and rules involved in locating the transmission line at issue. We find there is substantial evidence in the record to support the PUC's finding of fact relating to the use of existing rights-of-way for the approved route of the transmission line.

## CONCLUSION

We hold that the PUC's findings of fact and conclusions of law relating to environmental integrity and the utilization of existing rights-of-way are supported by substantial evidence, and did not result in an order that was arbitrary, capricious, or an abuse of discretion. We affirm the judgment of the district court.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed:   February 7, 2008

12