# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00528-CV

**Critical Health Connection, Inc., Appellant**

**v.**

**Texas Workforce Commission, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-07-001102, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

Appellant Critical Health Connection, Inc. ("CHC") filed suit against appellee the Texas Workforce Commission (the "Commission") seeking a refund of taxes that CHC paid under the Texas Unemployment Compensation Act. *See* Tex. Lab. Code Ann. §§ 201.001-217.007 (West 2006 & Supp. 2010) (the "Act"). CHC asserted that the workers whom the Commission had designated CHC's employees were actually independent contractors and, therefore, it was not responsible for contributing to the compensation fund on their behalf. After considering cross-motions for summary judgment, the trial court concluded that CHC was the "employer" of the workers in question and granted summary judgment in favor of the Commission.

On appeal, CHC argues that the trial court erred in concluding that CHC was the employer of the subject workers under sections 201.041 and 201.029 of the labor code. We will affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

CHC is a medical staffing company in San Angelo, Texas. It maintains a registry of medical service providers ("providers"), primarily nurses, whom it refers to its client hospitals and nursing homes in order to fulfill their short-term staffing needs. According to CHC, the providers listed in its registry are not required to accept a shift when offered, and many have never accepted a shift. Those providers who accept shifts are paid by CHC on an hourly basis according to rates negotiated between CHC and the individual provider. CHC charges its clients based on a "markup" from the rates CHC pays to its providers. CHC characterizes these providers as independent contractors.

In 2006 the Commission determined that the providers were not independent contractors but instead were employees of CHC. Under the Act, employers are required to contribute to the compensation fund on behalf of their employees in accordance with rules established by the Commission. *See* Tex. Lab. Code Ann. § 204.002 (West 2006). Based on its determination that the providers were CHC's employees, the Commission charged CHC for past-due contributions, penalties, and interest in the amount of $58,858.14. CHC paid this amount under protest and filed an appeal seeking a refund. Following an administrative hearing, the Commission denied CHC's refund request.

After exhausting its administrative remedies, CHC filed suit against the Commission for review of the Commission's refusal to allow a refund. *See* Tex. Lab. Code Ann. § 213.073 (West 2006) (providing waiver of sovereign immunity for suit by employing unit seeking review by trial de novo of Commission's refusal to allow adjustment or refund). The parties filed cross-motions

2

for summary judgment. In its motion, the Commission asserted that CHC is a "temporary help firm" under the Act and is therefore statutorily deemed to be the employer of the providers. Alternatively, the Commission argued that the summary-judgment evidence showed as a matter of law that the providers are CHC's "employees." CHC, on the other hand, argued that the summary-judgment evidence proved conclusively that the providers are independent contractors, not employees.[1]

After reviewing both parties' summary-judgment motions and responses, the trial court granted the Commission's motion and denied CHC's. This appeal followed.[2]

## DISCUSSION

In its first issue, CHC argues that the trial court erred in concluding that, under the definition of "employment" in section 201.041 of the labor code, the providers were CHC's employees. *See id.* § 201.041 (West 2006) (defining "employment" as service performed by individual for wages or under express or implied contract, "unless it is shown to the satisfaction of the commission that the individual's performance of the service has been and will continue to be free from control or direction under the contract and in fact"). In its second issue, CHC argues that the trial court erred in concluding that labor code section 201.029 deemed CHC the employer of the providers as a matter of law. *See id.* § 201.029 ("For purposes of this subtitle, a temporary help firm is the employer of an individual employed by the firm as a temporary employee."); *see also*

---

[1] The summary-judgment record consists mainly of testimony and affidavits of CHC's president and individuals who had worked as CHC providers, as well as the contractual agreements that CHC enters into with its clients and its providers, both of which designate the providers as independent contractors.

[2] Amicus Curiae FedEx Ground Package System, Inc., which currently has a similar dispute pending in Travis County district court, submitted a brief to this Court in support of CHC's position.

3

40 Tex. Admin. Code § 815.133(b) (2010) (Tex. Workforce Comm'n, Employee Staff Leasing & Temporary Help Firms).

Our resolution of these issues turns on our construction of the governing statutes. Statutory construction is a legal question, which we review de novo. *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008). In construing statutes, we ascertain and give effect to the legislature's intent as expressed by the statute's language. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We use definitions prescribed by the legislature and any technical or particular meaning the words have acquired. Tex. Gov't Code Ann. § 311.011(b) (West 2005); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008). Otherwise, we construe the statute's words according to their plain and common meaning, *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004), unless a contrary intention is apparent from the context, *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction would lead to absurd results, *University of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004). In determining the meaning of a statute, we consider the entire act, its nature and object, and the consequences that would follow from each construction. *Sharp v. House of Lloyd*, 815 S.W.2d 245, 249 (Tex. 1991).

Because the Commission is the agency that administers the Act, *see* Tex. Lab. Code Ann. §§ 301.061-.062 (West 2006), we give serious consideration to its construction. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *Farmers Tex. County Mut. Ins. Co. v. Romo*, 250 S.W.3d 527, 536 (Tex. App.—Austin 2008, no pet.); *see also* Tex. Gov't Code Ann. § 311.023(6) (West 2005) (court may consider administrative construction in construing statutes).

4

"In our 'serious consideration' inquiry, we will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Railroad Comm'n v. Texas Citizens For A Safe Future & Clean Water*, No. 08-0497, 2011 WL 836827, at *4 (Tex. Mar. 11, 2011) (quoting *First Am. Title Ins. Co.*, 258 S.W.3d at 632). This deference is tempered, however, by several considerations:

> First, it applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a court brief]. Second, the [statutory] language at issue must be ambiguous; an agency's opinion cannot change plain language. Third, the agency's construction must be reasonable; alternative *unreasonable* constructions do not make a policy ambiguous.

*Id.* (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747-48 (Tex. 2006)). With these rules of construction in mind, we now turn to CHC's first issue.

In its first issue, CHC asserts that the trial court erred in finding an "employment relationship" between CHC and the providers. Under the Act, an "employer" is obligated to contribute to the unemployment compensation fund "on wages for employment paid," in accordance with rules adopted by the Commission. Tex. Lab. Code Ann. § 204.002(a)-(b). The Act provides the following general definition of "employment":

> a service, including service in interstate commerce, performed by an individual for wages or under an express or implied contract of hire, unless it is shown to the satisfaction of the commission that the individual's performance of the service has been and will continue to be free from control or direction under the contract and in fact.

5

*Id.* § 201.041.[3]

The parties acknowledge that, pursuant to the legislative directive in section 201.041, the Commission has developed a multi-factor "right-to-control" test for determining whether an individual is in an "employment" relationship or is instead an independent contractor. *See* 40 Tex. Admin. Code § 815.134 (2010) (Tex. Workforce Comm'n, Employment Status: Employee or Independent Contractor); *see also id.* § 821.5 (Tex. Workforce Comm'n, Employment Status: Employee or Independent Contractor) (promulgating Commission's official 20-factor guideline for determining employment status).[4] They disagree, however, as to the standard by which the trial court and this Court should review the Commission's employee/independent contractor determination.

---

[3] The labor code does not define "independent contractor." As the parties agree, however, a definition can be logically derived from section 201.041—i.e., independent contractors are those individuals whose services are performed free from an employer's contractual right to control and also free from the actual direction or control of an employer.

[4] Although CHC argues that the common-law test articulated by the Texas Supreme Court in *Limestone Products Distribution, Inc. v. McNamara*, 71 S.W.3d 308 (Tex. 2002), "is determinative" of this appeal, it concedes that the two tests are similar and urges that proper application of either test will result in the correct classification of the providers as independent contractors. *Compare id.* at 312 ("The test to determine whether a worker is an employee rather than an independent contractor is whether the employer has the right to control the progress, details, and methods of operation of the work."), *with* 40 Tex. Admin. Code § 821.5 (Tex. Workforce Comm'n, Employment Status: Employee or Independent Contractor) (listing similar factors).

Much like the common-law test developed by the courts, the focus of the Commission's test is to determine whether the employer has a right to control not only the end sought to be accomplished, but also the means and details of its accomplishment. *See Thompson v. Travelers Indem. Co.*, 789 S.W.2d 277, 278 (Tex. 1990); *see also Pitchfork Land & Cattle Co. v. King*, 346 S.W.2d 598, 603 (Tex. 1961) (right of control is measured by considering independent nature of worker's business; worker's obligation to furnish necessary tools and equipment; worker's right to control progress of work, other than final result; time for which worker is employed; and method of payment, whether by unit of time or by job). Accordingly, we need only address the Commission's test.

6

The Commission asserts that the section 201.041 definition of employment mandates the "default standard" of substantial-evidence review because it establishes that the legislature entrusted the employment determination to the Commission's exclusive discretion. *See Dunn v. Public Util. Comm'n*, 246 S.W.3d 788, 791 (Tex. App.—Austin 2008, no pet.) (explaining that substantial evidence need only be more than mere scintilla, and "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence"). In further support of its position, the Commission also cites the standard-of-review provision in chapter 212 of the labor code, which governs judicial review of employee-benefit claims. *See* Tex. Lab. Code Ann. § 212.202(a) (West 2006) (imposing review standard of "trial de novo based on the substantial-evidence rule).

In response, CHC and the amicus take issue with what they refer to as the Commission's "sudden insistence" that the deferential substantial-evidence standard should apply to the issue of employment status, arguing that this position departs from long-standing Commission precedent and contradicts the plain and unambiguous language of section 213.073, which mandates review by trial de novo in unemployment tax refund cases. *See id.* § 213.073(c) (providing that trial of action filed under section 213.073 is by trial de novo). We agree that section 213.073(c) unambiguously provides for de novo review in this case and therefore reject the Commission's assertion that this appeal is governed by a more deferential standard of review. *See Texas Citizens*, 2011 WL 836827, at *4 (we are bound to defer to agency's statutory interpretation only when language is ambiguous).

7

The government code provides that when, as here, "the manner of review authorized by law . . . is by trial de novo, the reviewing court shall try each issue of fact and law in the manner that applies to other civil suits in this state as though there had not been an intervening agency action or decision . . . ." Tex. Gov't Code Ann. § 2001.173(a) (West 2008). Moreover, the Texas Supreme Court has already recognized that the legislature intended different standards of judicial review for taxpayer-refund claims under chapter 213 of the labor code and employee-benefit claims under chapter 212. *See Rowan Oil Co. v. Texas Employment Comm'n*, 263 S.W.2d 140, 142 (Tex. 1953) (interpreting predecessor statutes). In so doing, the court explicitly held that refund suits brought under section 213.073(c) are not appeals from orders of administrative agencies, and therefore the substantial-evidence rule "has no application." *Id.*; *see also Dickerson-Seely & Assoc., Inc. v. Texas Employment Comm'n*, 784 S.W.2d 573, 574 (Tex. App.—Austin 1990, no writ) (applying *Rowan Oil*), *disapproved on other grounds*, *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504 (Tex. 1995); *Armco Steel Corp. v. Texas Employment Comm'n*, 386 S.W.2d 894, 895 (Tex. Civ. App.—Austin 1965, writ ref'd n.r.e.) (same). Moreover, in *Dickerson-Seely*, this Court expressly rejected the argument the Commission now makes that the general definition of employment, now contained in labor code section 201.041, "somehow alters the scope of a trial de novo proceeding in a tax refund action. We hold that the fact-finder is to determine the question of employment status, like all issues of fact." 784 S.W.2d at 576.[5]

---

[5] In *Texas Workers' Compensation Commission v. Garcia*, the Texas Supreme Court determined that a "hybrid" system of judicial review, when it is mandated by statute, is not impermissible per se as this Court had suggested in *Dickerson-Seely*. *See* 893 S.W.2d 504, 531 n.28 (Tex. 1995). *Garcia* left intact, however, the core holding in *Dickerson-Seely*, which is the only matter relevant to this appeal.

8

In any event, the trial court in the present case determined that because the evidence was not in conflict, the question of whether the providers were CHC's employees or independent contractors was a question of law. *See, e.g.*, *Texas A & M Univ. v. Bishop*, 156 S.W.3d 580, 585 (Tex. 2005) ("When the material underlying facts are not in dispute and can give rise to only one reasonable conclusion, whether a worker was an employee or an independent contractor is a question of law."). The evidence relevant to each of the factors listed in the Commission's 20-factor test, as articulated in Commission rule 821.5, can be summarized as follows:

1.    INSTRUCTIONS:

*An Employee receives instructions about when, where, and how the work is to be performed. An Independent Contractor does the job his or her own way with few, if any, instructions as to the details or methods of the work.*

Once a provider accepts a shift, CHC instructs the provider about when and where to report for duty. When a provider arrives on-site, CHC's client gives the provider instructions on the details of a particular work assignment, as well as information regarding the facilities' rounds schedules and protocols. Providers otherwise perform their duties based on their education and experience.

2.    TRAINING:

*Employees are often trained by a more experienced employee or are required to attend meetings or take training courses. An Independent Contractor uses his or her own methods and thus need not receive training from the purchaser of those services.*

The providers receive no "essential job training" from CHC or its client facilities, but they do receive orientation from the clients regarding protocols, rules and regulations, and equipment.

3.    INTEGRATION:

*Services of an Employee are usually merged into the firm's overall operation; the firm's success depends on those Employee services. An Independent Contractor's services are usually separate from the client's business and are not integrated or merged into it.*

The providers' services are fully integrated into CHC's overall operation.

9

4.      SERVICES RENDERED PERSONALLY:

*An Employee's services must be rendered personally; Employees do not hire their own substitutes or delegate work to them. A true Independent Contractor is able to assign another to do the job in his or her place and need not perform services personally.*

The providers' services must be rendered personally; they cannot hire their own substitutes or delegate work that has been assigned to them.

5.      HIRING, SUPERVISING, & PAYING HELPERS:

*An Employee may act as a foreman for the employer but, if so, helpers are paid with the employer's funds. Independent Contractors select, hire, pay, and supervise any helpers used and are responsible for the results of the helpers' labor.*

The providers cannot hire helpers.

6.      CONTINUING RELATIONSHIP:

*An Employee often continues to work for the same employer month after month or year after year. An Independent Contractor is usually hired to do one job of limited or definite duration and has no expectation of continuing work.*

The providers are typically hired to do one job of limited duration and have no expectation of continuing work.

7.      SET HOURS OF WORK:

*An Employee may work "on call" or during hours and days as set by the employer. A true Independent Contractor is the master of his or her own time and works the days and hours he or she chooses.*

The providers are free to accept or decline a shift, but on acceptance they are obligated to work at the times dictated by the client. In some cases, a provider may request to vary the hours of a given shift, but decisions to grant such requests are made at the sole discretion of CHC or its client.

8.  FULL TIME REQUIRED:

*An Employee ordinarily devotes full-time service to the employer, or the employer may have a priority on the Employee's time. A true Independent Contractor cannot be required to devote full-time service to one firm exclusively.*

The providers are not required to exclusively devote full-time service to CHC or any of its clients.

9.  LOCATION WHERE SERVICES PERFORMED:

*Employment is indicated if the employer has the right to mandate where services are performed. Independent Contractors ordinarily work where they choose. The workplace may be away from the client's premises.*

The providers are free to accept shifts at the locations of their choosing, but on acceptance they are obligated to work at the location dictated by the client.

10.  ORDER OR SEQUENCE SET:

*An Employee performs services in the order or sequence set by the employer. This shows control by the employer. A true Independent Contractor is concerned only with the finished product and sets his or her own order or sequence of work.*

CHC and its client facilities provide guidelines and instruction that providers must follow, but the providers exercise professional discretion in performing the work assigned to them.

11.  ORAL OR WRITTEN REPORTS:

*An Employee may be required to submit regular oral or written reports about the work in progress. An Independent Contractor is usually not required to submit regular oral or written reports about the work in progress.*

The providers are required to complete a time log, signed by the client and submitted to CHC, for every shift they accept. In addition, some providers, such as nurses, are required to submit written reports of patient care as an integral function of their job.

12. PAYMENT BY THE HOUR, WEEK, OR MONTH:

*An Employee is typically paid by the employer in regular amounts at stated intervals, such as by the hour or week. An Independent Contractor is normally paid by the job, either a negotiated flat rate or upon submission of a bid.*

CHC pays providers by the hour.

13. PAYMENT OF BUSINESS & TRAVEL EXPENSE:

*An Employee's business and travel expenses are either paid directly or reimbursed by the employer. Independent Contractors normally pay all of their own business and travel expenses without reimbursement.*

In cases when CHC can negotiate reimbursement with its clients, CHC reimburses providers for mileage in addition to their hourly wage. Otherwise, CHC does not reimburse providers for their travel expenses.

14. FURNISHING TOOLS & EQUIPMENT:

*Employees are furnished all necessary tools, materials, and equipment by their employer. An Independent Contractor ordinarily provides all of the tools and equipment necessary to complete the job.*

CHC provides name badges for the providers to wear at clients' facilities. The providers furnish their own stethoscopes and scrubs, while the client facilities provide all other necessary equipment and tools.

15. SIGNIFICANT INVESTMENT:

*An Employee generally has little or no investment in the business. Instead, an Employee is economically dependent on the employer. True Independent Contractors usually have a substantial financial investment in their independent business.*

The providers are financially dependent on CHC and have no significant financial investment in the business.

16.     REALIZE PROFIT OR LOSS:

*An Employee does not ordinarily realize a profit or loss in the business. Rather, Employees are paid for services rendered. An Independent Contractor can either realize a profit or suffer a loss depending on the management of expenses and revenues.*

The providers receive only their hourly wage and do not realize profit or loss from CHC's or its clients' business.

17.     WORKING FOR MORE THAN ONE FIRM AT A TIME:

*An Employee ordinarily works for one employer at a time and may be prohibited from joining a competitor. An Independent Contractor often works for more than one client or firm at the same time and is not subject to a non-competition rule.*

The providers are permitted to work for other medical staffing referral agencies while still accepting shifts from CHC. CHC penalizes those clients who hire its providers directly.

18.     MAKING SERVICE AVAILABLE TO THE PUBLIC:

*An Employee does not make his or her services available to the public except through the employer's company. An Independent Contractor may advertise, carry business cards, hang out a shingle, or hold a separate business license.*

Since they are not required to work full time, the providers are free to work at different hospitals, work for different nursing agencies, and provide different services in other job sectors.

19.     RIGHT TO DISCHARGE WITHOUT LIABILITY:

*An Employee can be discharged at any time without liability on the employer's part. If the work meets the contract terms, an Independent Contractor cannot be fired without liability for breach of contract.*

If a client is not satisfied with a provider's performance, the client can discharge the provider and be liable to CHC only for the hours the provider actually worked.

20.     RIGHT TO QUIT WITHOUT LIABILITY

*An Employee may quit work at any time without liability on the Employee's part. An Independent Contractor is legally responsible for job completion and, on quitting, becomes liable for breach of contract.*

Providers are obligated to complete any shift they accept, and their failure to complete a shift may result in liability.

CHC concedes that five of the 20 factors—numbers 3, 4, 5, 11, and 12—favor a finding of employee, rather than independent contractor, status.[6] We agree that evidence relating to these five factors supports the Commission's position that the providers are employees. On the other hand, a comparable number of factors tends to favor independent contractor status (factors 6, 8, 17, and 18).[7] Regarding the remaining factors, the parties either dispute the legal effect of the evidence presented or disagree about which evidence is relevant to the analysis. As the trial court correctly discerned, however, the facts themselves are not disputed.

With respect to many of the remaining factors, the parties join issue as to whether the Commission could properly consider evidence of control exerted by CHC's *clients*, in addition to the control exercised—or contractually authorized to be exercised—directly by CHC itself. For instance, CHC argues that in analyzing the tools and equipment factor, we should look only to whether it furnishes the providers with any tools necessary to complete their work, not whether any

---

[6] In short, the providers are integrated into their employer's business, their services must be rendered personally, they are not permitted to hire helpers, they are required to submit oral or written reports, and they are paid hourly.

[7] These factors indicate that there is no continuing relationship between CHC and the providers, full-time service is not required, the providers are permitted to work for more than one firm at a time, and the providers are free to make their service available to the public.

14

equipment is provided by the clients. Similarly, CHC focuses only on whether it has the right to instruct the providers or direct the sequence of their work—not whether the clients have a right to do so. But neither the Commission's 20-factor test, nor the statutory definition of employment pursuant to which the test was adopted, indicate that the right of control should be limited in this way. In fact, the Commission asserts, we must consider "the entire work arrangement" by aggregating CHC's and its clients' relationship with the providers in order to accurately account for the unique business model of temporary help firms, which by their nature involve the delegation of authority among two—or more—employer entities. Because the Commission's position is reasonable and consistent with the statutory framework, we defer to it in our analysis of the remaining factors.

Accordingly, we conclude that instructions, training, and sequencing factors (numbers 1, 2, and 10 in the Commission's test), as well as the furnishing tools and equipment factor (number 14) weigh in favor of characterizing the providers as employees. Notwithstanding the fact that the providers are licensed medical professionals, their licenses do not prevent CHC's clients from instructing them in the particulars of their work or requiring compliance with the clients' round schedules and protocols. In order to complete their assignments, the providers must work alongside and report to the clients' medical staff, and they are subject to the same control and supervision as the clients' own employees. Similarly, although they are medical professionals and can therefore exercise some professional discretion in their work, the providers must also follow the clients' rules

15

and protocols providing for the method and sequence of performing certain tasks. In addition, the clients provide the majority of the equipment and tools necessary for the providers to complete their assignments.

Another recurring issue in the parties' differing characterizations of the evidence is CHC's belief that because providers can choose to accept or reject any given shift, they control their hours, the location of their work, and whether they realize a profit or a loss in their "business," which are all hallmarks of an independent contractor. The Commission responds that the providers' decision to accept or decline shifts as they see fit merely illustrates their "exercise of pre-employment discretion. A person's freedom to accept or decline employment," the Commission argues, "is different from the person's freedom from control once they have accepted a job." Based on the record presented, we agree with the Commission's interpretation of these factors. It is undisputed that once a provider accepts a shift, he or she has no discretion about when or where the work must be performed. Nor is there any evidence that the providers share in any profits or losses or otherwise invest in CHC's business. CHC's argument that providers can accept shifts that turn out to be more profitable than others mistakenly assumes that this element of the test concerns the individual worker's profit and loss. But, as CHC points out, the providers generally are not reimbursed by CHC for their travel expenses, so the fact that a provider elects to "profit" from his decision to accept a shift at a facility close to his home has no bearing on the profits or losses seen by CHC. We conclude that these factors—numbers 7, 9, 15, and 16—weigh in favor of finding that the providers are employees.

As demonstrated by the foregoing, a substantial majority of the relevant factors indicate that the providers are employees rather than independent contractors.[8] Therefore, because it is undisputed that CHC falls within the statutory definition of "temporary help firm," section 201.029 mandates that CHC is the providers' employer for purposes of contributing on their behalf to the unemployment compensation fund. *See* Tex. Lab. Code Ann. § 201.029 (West 2006) ("For purposes of this subtitle, a temporary help firm is the employer of an individual employed by the firm as a temporary employee."). We hold that the trial court did not err in granting summary judgment for the Commission on the ground that the record conclusively establishes that CHC is the providers' employer under the Commission's test. We overrule CHC's first issue.[9]

**CONCLUSION**

We affirm the trial court's grant of summary judgment in favor of the Commission.

---

[8] We agree with the Commission that, depending on the type of business and the nature of the services performed, not all of the 20 factors apply in every situation. Here, we conclude that factors 13, 19, and 20 (payment of business and travel expenses, right to discharge without liability, and right to quit without liability) are not particularly relevant or dispositive either way, and we do not address them.

[9] Having affirmed the summary judgment on this ground, we need not consider the alternative ground alleged in the Commission's motion, which is the focus of CHC's second appellate issue. We express no opinion as to the Commission's contention that section 201.029 deems CHC the employer of the providers as a matter of law.

17

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed:   April 27, 2011